UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

United States of America,

          Plaintiff,                 Case No.   15-cr-20312

v.                               Hon. Linda V. Parker
                                  United States District Court

Anthony Jelinek,

          Defendant.

---

## United States' Response Opposing
## the Defendant's Motion for Compassionate Release

In December 2014, Jelinek entered a room of a hotel that he did not have permission to access in Greenville, Texas, stealing an AR-15 Bushmaster rifle, magazines for the rifle, a Versace bag, and several articles of clothing. (PSR ¶12). The semi-automatic firearm Jelinek stole, pictured below, is a serious weapon:



1

Not only did Jelinek steal a firearm, he also was not lawfully allowed to possess any firearm due to numerous prior felony convictions, including two assault-related convictions. (PSR ¶¶ 40-41, 48-49).

Law enforcement arrested Jelinek for the offense in the Eastern District of Michigan and the case remained in the district pursuant F.R.C.P. 20 for his plea and sentencing to one count of being a felon in possession of a firearm.

The Court sentenced Jelinek to 84 months in federal prison on September 16, 2015. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

*First*, since January 2020, the Bureau of Prisons has been preparing for Covid-19, implementing strict precautions to minimize the virus's spread in its facilities. Following two recent directives from the Attorney General, the Bureau of Prisons is also assessing its entire prison population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. This process necessarily requires the

Bureau of Prisons to identify the best candidates for release, ensure that their homes are suitable for home confinement, and arrange a way to quarantine each of them for 14 days. As of May 29, 2020, these directives have already resulted in at least 3,392 inmates being placed on home confinement. *See* BOP Covid-19 Website.

Jelinek's offense and criminal history make him a danger to the community, which precludes release under USSG § 1B1.13(2), because Jelinek has a history of assault, chronic substance abuse issues which have persisted through his incarceration, and he committed the burglary of a serious assault weapon in the present case. And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release because release would depreciate the serious nature of this offense and fail to protect the public from further crimes by Jelinek.

## Background

On December 19, 2014, a hotel manager in Greenville, Texas, noticed several items missing from a storage area on the fourth floor of the hotel, including an AR-15 Bushmaster rifle, magazines for the rifle, Versace bag, and several articles of clothing. (PSR ¶ 12.). Upon viewing

3

the hotel surveillance video, the manager realized that Jelinek took several items and returned to his room on several different occasions over the last few days. *Id.* Officers made contact with Jelinek in his hotel room and found a duffel bag, which contained the magazine and disassembled Bushmaster rifle. (PSR ¶13). When confronted by an ATF Agent, Jelinek admitted to taking the firearm while on Xanax and alcohol. (R. 9-3: Govt Sent. Mem., Exhibit B, Pg.ID 60). Jelinek's burglary of a firearm while under the influence of drugs and alcohol is a fairly aggravated violation of 18 U.S.C. § 922(g).

In addition to this offense, Jelinek has a lengthy and troubling criminal history. Jelinek first received an assault and battery conviction in 1998. (PSR ¶31). Over the next two years, a multitude of convictions followed, mostly for petty theft offenses brought on by an apparent drug and alcohol program. (PSR ¶¶32-39). In 2001, Jelinek received a felonious assault conviction when he hit a gas station employee with his car after stealing gas. (PSR ¶40). When arrested, Jelinek had heroin and paraphernalia for heroin use on his person. *Id.*

Jelinek then received two domestic violence convictions. (PSR ¶¶41-45). The most aggravating of these involved Jelinek smashing the

4

windshield of a car which contained his child restrained in a car seat and then hitting that car with his own car while escaping the scene. (PSR ¶45).

In an incident that defies explanation, Jelinek and a neighbor began an argument over pornographic DVDs that escalated into a physical fight. (PSR ¶49). From there, it escalated into Jelinek threatening to kill the neighbor and later cutting him with a knife. *Id.*

Jelinek was detained by consent during the pendency of this case and the court sentenced him to 84 months in federal prison on September 16, 2015. He is currently incarcerated at FCI Hazelton. He is 50 years old, and his projected release date is March 26, 2021.

Since his incarceration, Jelinek has twice been found to be either using or possessing controlled substances. (Gov'ts. Exs. 1 and 2).

Jelinek has medical conditions that include a serious heart condition as defined by the CDC. Jelinek has moved for compassionate release, citing his medical conditions and the Covid-19 pandemic. Jelinek has properly exhausted his administrative remedies and this Court can decide his motion.

## Argument

**I.    The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

   **A.    The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *See* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *See id.* Only limited group gathering is allowed, and social distancing is maximized. Staff and inmates are also issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation.

6

Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. In areas with sustained community transmission, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted. Contractors are only permitted access if performing essential services, and any contractor who requires access is screened for symptoms and risk factors. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits

7

are permitted on a case-by-case basis after the attorney has been
screened for infection.

Like all other institutions, penal and otherwise, the Bureau of
Prisons has not been able to eliminate the risks from Covid-19
completely, despite its best efforts. But the Bureau of Prisons' measures
will help federal inmates remain protected from Covid-19 and ensure
that they receive any required medical care during these difficult times.

### B. The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing
the placement of federal prisoners in home confinement. New
legislation now temporarily permits the Bureau of Prisons to "lengthen
the maximum amount of time for which [it] is authorized to place a
prisoner in home confinement" during the Covid-19 pandemic.
Coronavirus Aid, Relief, and Economic Security Act (CARES Act)
§ 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020).
The Attorney General has also issued two directives, ordering the
Bureau of Prisons to use the "various statutory authorities to grant
home confinement for inmates seeking transfer in connection with the
ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord*

04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 3,545 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Attorney General's directives have explained, these home-confinement decisions have required evaluating several criteria:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the Covid-19 pandemic far better than any other solution does. The Bureau of Prisons cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. It must focus on the

inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). The Bureau of Prisons' home-confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is more than reasonable to evaluate whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. And if a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, he would also be far more likely than the general public to contract and spread Covid-19 if released.

10

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451,

11

2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II. The Court should deny Jelinek's motion for compassionate release.

Jelinek's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

Jelinek must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A).

12

To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

Even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).b

### A.    Jelinek has a qualifying health condition but his dangerousness precludes his release.

Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well

developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Here, Jelinek has a qualifying medical condition. The over 600 pages of medical records reviewed by the government demonstrate that the BOP has provided Jelinek substantial medical care during his time in custody, including the December 2018 aortic valve replacement that he discusses within his brief. Jelinek also notes that he has a history of surgeries with post-operative infections, which does not seem to be a CDC risk factor. Were it not for Covid-19, there would be little question that the BOP could manage his health condition, as they have consistently done so.

In fact, Jelinek's circumstances raise the question whether he is at greater risk if released than in custody. Thus far, he has received strong medical care at a facility with no active Covid-19 cases amongst inmates and one active case in a staff member. https://www.bop.gov/coronavirus/. Genesee County, Michigan, where Jelinek seeks release to, has over 2,000 historical cases of Covid-19. https://gchd.us/coronavirus/.

14

The *average* person may have a higher relative risk of contracting Covid-19 in prison than if released among the public at large. But § 1B1.13 requires an *individualized* assessment, and an individual defendant's relative risk varies widely. *See United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *4–*5 (E.D. Mich. May 15, 2020). It depends on the precautions at his prison, the number of Covid-19 cases there, whether and how much that number might increase or decrease, the prison's medical facilities, the defendant's release plan, the threat from Covid-19 in his release location, his access to medical care if released, and his willingness to abide by release restrictions and social-distancing protocols. *See id.* Here, Jelinek's history of discipline in prison for drug use and possession means that he is unlikely to engage in safe behaviors in the community. In the event of a Covid-19 resurgence, it is significantly less likely that Jelinek will follow the dictates of shelter in place order if he reverts to using controlled substances, placing himself and others at risk.

While Jelinek's medical conditions and the Covid-19 pandemic may satisfy the initial criteria for eligibility in USSG § 1B1.13 cmt. n.1, Jelinek is ineligible for compassionate release because he is a danger to

15

the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." It thus prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010). It also bars the release of many other defendants. An evaluation of dangerousness under § 3142(g) requires a comprehensive view of community safety—"a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam). So even many "non-violent" offenders—such as those who have been involved in serial or significant fraud schemes—may not be released under § 3582(c)(1)(A). USSG § 1B1.13(2); *see Stone*, 608 F.3d at 948 n.7.

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-

19-based fraud schemes have proliferated. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

Because Jelinek's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). Jelinek's crime here involves stealing a semi-automatic firearm while under the influence of Xanax and alcohol. Most disturbing though is Jelinek's prior record for assaultive behavior. Jelinek has four prior assault convictions, two of which were for felonious assaults. (PSR ¶¶ 31, 40, 45, 49). He has a lengthy history of substance abuse and while in custody has twice received discipline for possessing using controlled substances.

### B.    The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the

17

"[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Jelinek eligible for compassionate release, the § 3553(a) factors should still disqualify him.

Jelinek's offense disqualifies him because it is very serious to possess a semi-automatic weapon and high capacity magazines after numerous assaultive convictions, including convictions that prohibit him from no longer possessing a firearm. (PSR ¶ 12). Jelinek not also possessed these items, he stole them over the course of several days. *Id.* Jelinek told the PSR writer he was under the influence of drugs and alcohol at the time of the offense – which further aggravates this offense given his history and behavior while in custody.

The most serious § 3553(a) factor which weighs against Jelinek's release is his character. He has consistently violated the law in ways

18

that place others in danger and directly assaulted others. (PSR ¶¶ 31-49). He has 19 separate cases with criminal convictions. *Id.* Jelinek's prior record and discipline history in custody demonstrate that he is not able to control himself and is a danger to the public. Jelinek's violent behavior speaks poorly to his character and factors heavily against compassionate release.

Jelinek's history of violent behavior and the seriousness of his offense mean that his early release disregards the need to protect the public from Jelinek's behavior. Releasing Jelinek from his sentence is a risk to the public that is not warranted.

## III.   If the Court were to grant Jelinek's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Jelinek's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## Conclusion

Jelinek's motion should be denied.


                                    Respectfully submitted,

                                    MATTHEW SCHNEIDER
                                    United States Attorney

Date: June 1, 2020                  s/*Christopher W. Rawsthorne*
                                    Christopher W. Rawsthorne
                                    Assistant United States Attorney
                                    600 Church Street
                                    Flint, MI  48502
                                    (810) 766-5177
                                    christopher.rawsthorne@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 1, 2020, the foregoing document was electronically filed by an employee of the United States Attorney's Office with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Glenn M. Simmington

<u>s/Christopher W. Rawsthorne</u>
Assistant United States Attorney